UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRAIG MOONEY,

       Petitioner,

                                       CASE NO. 05-CV-71329-DT

    v.                                CHIEF JUDGE BERNARD A. FRIEDMAN
                                         MAGISTRATE JUDGE PAUL J. KOMIVES

JAN TROMBLEY,

       Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    *Newly Discovered Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    E.    *Ineffective Assistance of Counsel (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             a. Fee Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             b. Lack of Time Meeting/Preparing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             c. Failure to Investigate/Present Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . 19
             d. Failure to Object . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
             e. Conceding Guilt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    F.    *Prosecutorial Misconduct (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             a. Misstatement of Facts in Cross-Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             b. Introduction of Inadmissible Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
             c. Closing Argument Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    G.    *Replaying of Victim's Testimony (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    H.    *Request for Evidentiary Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner Craig Mooney is a state prisoner, currently confined at the Saginaw Correctional Facility in Freeland, Michigan.

2.      On April 3, 2001, petitioner was convicted of two counts of first degree criminal sexual conduct (CSC-I), MICH. COMP. LAWS § 750.520b(1)(e); and one count of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, following a jury trial in the Livingston County Circuit Court. On July 19, 2001, he was sentenced to concurrent terms of 13-20 years' imprisonment on the CSC-I convictions, and to a concurrent term of 1-4 years' imprisonment on the assault conviction.

3.      Petitioner thereafter filed a motion for new trial in the trial court, alleging ineffective assistance of counsel. Following an evidentiary hearing, the trial court denied the motion on October 30, 2002.

4.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.      THE COMPLAINANT'S PRIOR UNSWORN STATEMENT DID NOT QUALIFY AS A PRIOR CONSISTENT STATEMENT, BECAUSE THE DEFENSE DID NOT MAKE A CLAIM THAT THE COMPLAINANT'S TESTIMONY WAS A RECENT FABRICATION.

    II.     DEFENDANT WAS DEPRIVED OF A FAIR TRIAL BY THE PERVASIVE MISCONDUCT OF THE PROSECUTOR.

    III.    DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO INVESTIGATE, FAILURE TO PREPARE, AND SUBSTANDARD PERFORMANCE AT TRIAL.

    IV.     DEFENDANT WAS DEPRIVED OF A FAIR TRIAL UNDER THE

MICHIGAN AND UNITED STATES CONSTITUTIONS WHERE OVER
OBJECTION THE VIDEO RECORDING OF THE COMPLAINANT'S
TESTIMONY, WHICH INCLUDED ELEMENTS NOT PART OF HER
TESTIMONY, WAS REPLAYED FOR THE JURY DURING
DELIBERATIONS.

V.      A NEW TRIAL IS WARRANTED BECAUSE OF NEWLY DISCOVERED
EVIDENCE WHICH CONTRADICTED MRS. MOONEY'S TRIAL
TESTIMONY AND INDICATED NOT ONLY THAT SHE LIED BUT
ALSO THAT DEFENDANT IS INNOCENT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Mooney*, No. 236424, 2003 WL 22112325 (Mich. Ct. App. Sept. 11, 2003) (per curiam).

5.      Petitioner, through counsel, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Mooney*, 471 Mich. 915, 688 N.W.2d 510 (2004).

6.      Petitioner, through counsel, filed the instant application for a writ of habeas corpus on

April 5, 2005.  As grounds for the writ of habeas corpus, he raises four claims:

I.      DEFENDANT WAS DEPRIVED OF DUE PROCESS UNDER THE
UNITED STATES CONSTITUTION WHERE THE TRIAL COURT
REFUSED TO HOLD AN EVIDENTIARY HEARING ON NEWLY
DISCOVERED EVIDENCE WHICH WARRANTED A NEW TRIAL AND
INDICATED THAT NOT ONLY DID THE COMPLAINANT LIE BUT
ALSO THAT DEFENDANT IS INNOCENT.

II.     DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF
COUNSEL BY COUNSEL'S FAILURE TO INVESTIGATE, FAILURE TO
PREPARE, AND SUBSTANDARD PERFORMANCE AT TRIAL.

III.    DEFENDANT WAS DEPRIVED OF A FAIR TRIAL UNDER THE UNITED
STATES CONSTITUTION BY THE MISCONDUCT OF THE
PROSECUTOR.

IV.     DEFENDANT WAS DEPRIVED OF A FAIR TRIAL UNDER THE UNITED
STATES CONSTITUTION WHERE, OVER OBJECTION, THE VIDEO
RECORDING OF THE COMPLAINANT'S TESTIMONY, WHICH
INCLUDED ELEMENTS NOT PART OF HER TESTIMONY, WAS
REPLAYED FOR THE JURY DURING DELIBERATIONS.

Counsel for petitioner filed a brief in support of the application for the writ of habeas corpus on

September 28, 2005.

       7.     Respondent filed his answer on October 10, 2005. He contends that petitioner's claims

are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

       The factual background leading to petitioner's conviction was summarized by the Michigan

Court of Appeals:

> The trial occurred in March and April of 2001. Robert Abbo testified that the victim, Claudia Mooney, entered his Mobil gas station during the early morning hours of December 15, 2000, with a bruised and bloody face. Abbo testified that Mooney was shaking, seemed "very upset and scared," and asked to call the police because her husband (defendant) had "beat her up."
>
> Mooney testified that she married defendant in 1997 and that their relationship began deteriorating when defendant lost his business in 2000. She stated that defendant was upset about losing the business, that he began using alcohol and cocaine, and that he accused her of having extramarital affairs. Mooney denied having been unfaithful during her marriage.
>
> Mooney further testified as follows: On, December 14, 2000, she returned home from work to find defendant upset and wanting drugs. She agreed to drive him to his drug supplier because he had been drinking alcohol and she did not want him to drive while drunk. After returning home around 9:00 p.m., she told defendant that she had an appointment the following morning to look at a new apartment for herself. Defendant then asked her to "get out," but she had nowhere to go because her family lives in Germany. She finally left and checked into a nearby motel. Defendant called her at the motel around 4:30 a.m., screamed at her, and told her that she needed to get their dogs and her possessions from the house because he was going to "blow it up."
>
> Mooney testified that she returned to the house, put the dogs into her vehicle, and was going back inside the house to get some things when defendant pulled her coat and told her that she was not going to leave. She stated that he had a knife, that he began accusing her again of infidelity, and that he wanted her to admit to having had affairs. She stated that she wrote down some make-believe stories about affairs just to calm him down and that defendant then began punching her. According to Mooney, defendant then directed her to remove her clothes, after which he forced apart her legs and forced a dildo inside her vagina, asking her "if that's how it felt when I had sex with all those other men." She admitted that she and defendant had used the dildo for consensual sex in the past. She testified that he repeated the assault with the dildo at a later point on the night in question and also forced his hand inside of her. She denied consenting to the penetrations and stated that, because of the knife,

she had no choice but to submit to them. Mooney testified that defendant kicked, pushed, and punched her and that she believed he was going to kill her. She finally departed and walked to Abbo's gas station. After returning to the house with the police, she found the house "destroyed" and discovered that a window of her vehicle had been smashed. She later filed for divorce from defendant.

On cross-examination, the defense attorney pointed out that defendant had a scratch on his shoulder in a picture apparently taken on December 15, 2002. He also pointed out that Mooney had told the police that the assault occurred with a vibrator and not a non-vibrating dildo. He also implied that (1) some of the blood produced that night was the result of Mooney's menstrual period and (2) the parties were fighting, as a result of their divorce proceedings, over how to divide their shared assets.

Officer Amy Danforth of the Green Oak Township Police Department testified that she met Mooney at Abbo's gas station on December 15, 2000. Danforth testified that Mooney was "quite beat up" and shaken and told Danforth she had been sexually assaulted. Danforth stated that [defendant] had a cut on his wrist[1] but that his injury paled in comparison to Mooney's injuries.

Dr. Mark Grant, an emergency room physician, testified that he examined Mooney on December 15, 2000. According to Grant, Mooney stated that she had been sexually assaulted by her husband with a dildo. Grant found several bruises and scratches on Mooney's face, neck, and arms, as well as a bruise on her thigh. He found no lacerations or other trauma on her vagina or rectum, but he stated that this absence did not negate the possibility of a sexual assault.

Sergeant Richard Walter of the Green Oak Township Police Department testified that he went to defendant's house on the morning of December 15, 2000, and found it in disarray. He stated that defendant appeared to be under the influence of drugs or alcohol. Walter stated that he found cocaine in the residence.

Defendant testified as follows: His marriage to Mooney was deteriorating in December 2000 because she had had two extramarital affairs. When she returned home from work on December 14, 2000, he stated that he needed a ride to his vehicle, which was in another city, and that he needed to get some cocaine. He wanted to go to a motel that night, but Mooney wanted him to return home. She drove him to get cocaine. While returning from the cocaine supplier, he told her that he would be able to obtain most of the couple's assets if they were to divorce. They then stopped at his vehicle, and he was intending to get into it and go away for the weekend when Mooney persuaded him to return to their house. When they did return to the house, they began some consensual sexual activity involving the dildo, but he abruptly stopped the sexual activity. He then asked Mooney to leave, which she did.

Defendant testified that Mooney's brother telephoned from Germany between 4:00 and 5:00 a.m. Defendant became upset and called Mooney at the Best Western motel to tell her that he was going to blow up the house with himself inside it and that she should come to retrieve the dogs. He then began destroying the house, after which

---

[1]Mooney testified that defendant caused this cut himself by punching a glass picture frame.

Mooney returned home. Defendant testified that he took a knife and told her that she would see him kill himself if she did not leave the house. He stated that Mooney tried to get the knife from him and that they then hugged each other, after which he again told her that he was going to blow up the house. He testified that Mooney subsequently tried to initiate sex with him but that he did not go through with it because he was upset. He testified that Mooney threw a jar at him, cutting his wrist, and that he hit her, pushed her, and held her down on the couch. He claimed that Mooney cut his back with the knife, after which he hit her again, dragged her out of the house, and kicked her. He stated that Mooney kept wanting to come back into the house to get her things, so he destroyed her purse and its contents, as well as some of her clothes and underwear.

Defendant presented no witnesses other than himself, and the jurors convicted defendant as charged.

*Mooney*, 2003 WL 22112325, at *1-*2, slip op. at 1-3.

Following the trial, the court held an evidentiary hearing on petitioner's ineffective assistance of counsel claims. The evidentiary hearing testimony is fully detailed in petitioner's brief. *See* Br. in Supp. of Pet., at 22-28. Summarized more briefly, petitioner's trial counsel, Mark Gatesman, testified that his firm had a contract with the court which paid him $590.00 per case for 150 cases, regardless of the amount of time spent on the case, accounting for 50-60% of his firm's work and 30-40% of its income. He spent over 100 hours working on petitioner's case. *See* Evid. Hr'g Tr., Vol. I, at 8-11. He visited petitioner four times, each time in a non-contact room because he does not like being frisked. *See id*. at 13-15, 20-21. He did not act on several requests from petitioner to investigate various evidence–the marital home, the blood on the knife, and the victim's ATM records–because he did not believe that they would yield any relevant or useful evidence. *See id*. at 28-29, 36-37, 58-59. He did not call petitioner's parents for the same reason. *See id*. at 44.

Petitioner's mother, Louise Mooney, testified that she dumped out a bottle of vodka at the home on the day after the assault, and that the victim typically drank vodka. *See* Evid. Hr'g Tr., Vol. II, at 8-10. Although she and petitioner's father spent the entire day with the victim, the victim never said that she had been sexually assaulted. *See id*. at 10. Shortly thereafter, the victim admitted to

Louise Mooney that she had had an affair with a co-worker. *See id.* at 22. Louise Mooney visited petitioner in jail on the day after his arrest, and he had a four inch slash on his back which did not look like a fingernail scratch. *Id.* at 13-14. Petitioner told her that the victim had slashed him with a knife. *Id.* at 30. She and her husband met with Gatesman three times. He did not take notes, and did not think she should testify, although she wanted to do so. *See id.* at 14-17. After the trial, Louise Mooney and her husband when to the home to get petitioner's things. There they discovered a large pile of "girlie" magazines on the floor in one of the bedrooms, as well as several printed e-mail messages written by the victim soliciting another woman for three-way sex with her and petitioner. *See id.* at 17-18.

Petitioner's father, Virgil Mooney, testified that the victim admitted she had been drinking prior to the assault. *See id.* at 66-67. He corroborated his wife's testimony concerning their meetings with Gatesman, their desire to testify, and the discovery of the pornographic magazines at the home. *See id.* at 71-74. Keith Mooney, petitioner's brother, testified that he went to the home to pick up some of petitioner's things, and while there found lingerie, sex toys, and magazines. *See id.* at 78-79.

Finally, petitioner testified that he met with Gatesman a few times, and only in non-contact rooms. Gatesman took no notes in their first two meetings, and failed to pursue several avenues of investigation, claiming he did not have the time or money to do so. *See id.* at 5-18. Petitioner told Gatesman that the victim had admitted to him that she had had an affair, and had likewise admitted this to petitioner's mother. Despite petitioner's request, Gatesman refused to call petitioner's parents because he believed a jury would not find them credible. *See id.* at 22-23. He likewise asked Gatesman to have the blood on the knife tested, and told him that the victim used cocaine and that her ATM records would show that she had withdrawn cash on the way to their supplier. *See id.* at 29-34, 38-39. He did not consent to Gatesman conceding his guilt on the assault count. *See id.* at 40.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.  However,

"[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Newly Discovered Evidence (Claim I)*

Petitioner claims that he was denied a fair trial when the trial court refused to consider his newly discovered evidence, consisting of the testimony of Michael York.  According to York, he worked with the victim and began an affair with her in October 2000, which continued for some time. York also averred that the victim told him that she and her husband had engaged in consensual sex on the night in question.  *See* Pet'r's Br., App. 5, Aff. of Michael York.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, the existence of new evidence, standing alone, is not a basis for granting the writ.  As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id*. at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).  Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief.

Petitioner also claims that he is entitled to the writ based upon the state trial court's denial of

his motion for new trial based upon the newly discovered evidence. However, because a federal habeas court may not correct a state court's misapplication of its own law, *see, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Beck v. Washington*, 369 U.S. 541, 544 (1969), a state trial court's denial of a motion for a new trial based upon newly discovered evidence is not a ground for habeas relief. As one court has explained:

> The criteria for a trial court in granting or denying a new trial are matters of state law. As such an incorrect application would not be grounds for federal habeas corpus relief, unless the alleged error constituted "a fundamental defect which inherently results in a complete miscarriage of justice."

*Ward v. Wolff*, 499 F. Supp. 1129, 1131 (D. Nev. 1980) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)); *see also*, *Buford v. Perini*, No. 85-3862, 1986 WL 18098, at *3 (6th Cir. Oct. 10, 1986) ("[T]he denial of petitioner's post-trial motion [for new trial based upon newly discovered evidence] is simply a matter of state law which cannot serve as a basis for federal habeas corpus relief."); *Subilosky v. Callahan*, 689 F.2d 7, 9 (1st Cir. 1982).

Nor does the trial court's failure to hold an evidentiary hearing on petitioner's newly discovered evidence claim in connection with his postconviction motion warrant habeas relief. Nothing in the Constitution requires a state to establish a system of postconviction review, and thus "an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition." *Gee v. Groose*, 110 F.3d 1346, 1351-52 (8th Cir. 1997) (internal quotation omitted); *accord Dawson v. Snyder*, 988 F. Supp. 783, 826 (D. Del. 1997) (citing *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) and *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992)). Accordingly, the trial court's failure to hold an evidentiary hearing, even if erroneous under state law, does not entitle petitioner to habeas relief. *See Chaussard v. Fulcomer*, 816 F.2d 925, 932 (3d Cir. 1987); *Edwards v. State of Kansas*, 751 F. Supp. 197, 199 (D. Kan. 1990).

11

Petitioner attempts to circumvent this conclusion by arguing that the newly discovered evidence shows that the victim perjured herself, and that he had a due process right not to be convicted on the basis of perjured testimony. This claim fails, however, because petitioner has not alleged that the prosecutor knew or should have known of the alleged perjury. As the Sixth Circuit has explained, in order for a witness's perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975). Petitioner's reliance on *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003) and *Hall v. Director of Corrections*, 343 F.3d 976 (9th Cir. 2003), is misplaced. It is true that those cases permit a finding of a due process violation based on the presentation of perjured testimony even where the prosecution is unaware of the perjury. However, every other circuit to consider the issue has rejected this conclusion, and requires a showing of prosecutorial involvement in the perjury. *See White v. Hancock*, 355 F.2d 262, 263-64 (1st Cir. 1966); *United States ex rel. Helwig v. Maroney*, 271 F.2d 329, 332 (3d Cir. 1959); *Stockton v. Virginia*, 852 F.2d 740, 748-49 (4th Cir. 1988); *Smith v. Black*, 904 F.2d 950, 962 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992); *Burks*, 512 F.2d at 229; *Reddick v. Haws*, 120 F.3d 714, 718 (7th Cir. 1997); *Johnson v. Bennett*, 386 F.2d 677, 680 (8th Cir. 1967), *vacated on other grounds*, 393 U.S. 253 (1968); *Smith v. Gibson*, 197 F.3d 454, 459-60 (10th Cir. 1999); *Jacobs v. Singletary*, 952 F.2d 1282, 1287 n.3 (11th Cir. 1992).[2] More importantly, the Sixth Circuit, the decisions of which are binding on this Court, requires such a showing, *see Burks*, 512 F.2d at 229, a requirement which the Sixth Circuit has repeatedly reaffirmed, *see, e.g.*, *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999); *Ford v. United States*, No. 94-3469,

---

[2]It is not entirely clearly whether the Eighth Circuit still follows this rule. Although *Johnson* has not been overruled, in *Lewis v. Erickson*, 946 F.2d 1361, 1362 (8th Cir. 1991), the court granted habeas relief on the basis of perjured testimony without discussing the prosecutor's role in presenting the perjury.

12

1994 WL 521119, at *2 (6th Cir. Sept. 23, 1994); *Akbar v. Jago*, No. 84-3540, 1985 WL 13195, at

*1 (6th Cir. Apr. 10, 1985); *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975).

And even more importantly, these decisions themselves are irrelevant because petitioner is

entitled to habeas relief only if he can show an unreasonable application of "clearly established

Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The Supreme Court has

never held that due process is violated when the prosecutor does not know about the alleged perjury.

On the contrary, in *Napue v. Illinois*, 360 U.S. 264 (1959), the Court held only that "it is established

that a conviction obtained through use of false evidence, *known to be such by representatives of the*

*State*, must fall under the Fourteenth Amendment." *Id*. at 269 (emphasis added). The Supreme Court

has consistently reiterated this formulation of the due process standard, noting only that due process

is violated by the "*knowing* use of perjured testimony." *United States v. Agurs*, 427 U.S. 97, 103

(1976) (emphasis added); *see id*. at 103-04 & nn. 8-9 (discussing cases). However, "[t]he Supreme

Court has never held that due process is offended by a conviction resting on perjured testimony where

the prosecution did not know of the testimony's falsity at trial." *LaMothe v. Cademartori*, No. C 04-

3395, 2005 WL 3095884, at *5 (N.D. Cal. Nov. 11, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067

(1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to

consider the question of whether due process is violated by a conviction based on perjured testimony

regardless of the prosecutor's knowledge)); *see also*, *Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir.

1999) (rejecting Second Circuit's view as inapposite under the AEDPA, because the Supreme Court

has never extended *Napue* to situations involving perjury about which a prosecutor had no

knowledge).

In short, regardless of the correctness of the state courts' decisions with respect to the newly

discovered evidence as a matter of state law, petitioner has failed to establish that their handling of

13

this issue was contrary to, or an unreasonable application of, any clearly established Federal law as determined by the Supreme Court. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Ineffective Assistance of Counsel (Claim II)*

Petitioner next contends that his trial counsel was constitutionally ineffective. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the

14

exercise of reasonable professional judgment." *Id*. at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

      2.     *Analysis*

### a. Fee Structure

Petitioner first contends that his counsel was *per se* ineffective because counsel had a contract with the trial court which paid counsel $590.00 per case, regardless of the amount of time spent on the case.  Because counsel spent in excess of 100 hours on the case, he made less than $6.00 per hour, contrary to his normal billing rate of $150.00 per hour, and to the rates of $75.00 and $90.00 per hour in other local courts.  Petitioner contends that the fee system created a constructive absence of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), such that a showing of prejudice with respect to his ineffective assistance of counsel claims is not necessary.  The Court should disagree.

Petitioner has pointed to no clearly established Supreme Court precedent requiring application of the presumed prejudice standard in the circumstances present here.  The Supreme Court has limited the presumed prejudice standard to three types of ineffective assistance claims: (1) complete denial of counsel; (2) government interference with the right to counsel; and (3) conflicts of interest.  *See Smith v. Robbins*, 528 U.S. 259, 287 (2000) (citing *Strickland*, 466 U.S. at 692; *Cronic*, 466 U.S. at 659 & n.25).   The Supreme Court has stated that the first category–complete denial of counsel–encompasses both actual and constructive denials of counsel, and that a constructive denial of counsel can occur where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659.  Petitioner argues that the fee structure in this case created a constructive denial of counsel under the first category.

15

The Supreme Court has recently explained, however, that for an ineffective assistance claim to come within this limited exception to *Strickland*, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). The distinction is between "bad lawyering" and "no lawyering," *Woodard v. Collins*, 898 F.2d 1027, 1028 (5th Cir. 1990); *see also*, *Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002), and the difference is not one of degree, but one of kind, *see Bell*, 535 U.S. at 697.

Here, petitioner has not demonstrated that counsel completely failed to subject to the prosecution's case to meaningful adversarial testing. Counsel met with petitioner, apparently conducted some investigation, and argued various matters on petitioner's behalf. *See Moss*, 286 F.3d at 859; *Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002); *Cooks v. Ward*, 165 F.3d 1283, 1296 (10th Cir. 1998). All of petitioner's claims are run-of-the-mill pretrial and trial error claims subject to the *Strickland* framework. *See, e.g.*, *Patrasso v. Nelson*, 121 F.3d 297, 300 (7th Cir. 1997); *Gregory v. United States*, 109 F. Supp. 2d 441, 450 (E.D. Va. 2000). In short, "[t]he aspects of counsel's performance challenged by [petitioner] . . . are plainly of the same ilk as other specific attorney errors [the Supreme Court] ha[s] held subject to *Strickland*'s performance and prejudice components." *Bell*, 535 U.S. at 697-98.

The cases relied upon by petitioner are circuit and district court cases, and thus do not constitute clearly established law under § 2254(d)(1). More fundamentally, the cases do not support petitioner's position that prejudice should be presumed here. For example, in *Martinez-Macias v. Collins*, 979 F.2d 1067 (5th Cir. 1982), the court affirmed a grant of habeas relief on the basis of ineffective assistance of counsel, noting in passing that "[t]he state paid defense counsel $11.48 per hour. Unfortunately, the justice system got only what it paid for." *Id*. at 1067. However, the court did not engage in any substantive analysis, instead adopting the opinion of the district court. *See id*. And the district court did not apply a presumption of prejudice to any of the petitioner's claims.

16

Rather, the court discussed only *Strickland* in setting forth the legal standard governing the petitioner's ineffective assistance claims, *see Martinez-Macias v. Collins*, 810 F. Supp. 782, 790-91 (W.D. Tex. 1991), and with respect to each claim upon which it granted relief the court found prejudice to exist, *see id*. at 805, 811, 812-13, 818, 823. Similarly, in *Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000), the court analyzed the petitioner's claims solely under *Strickland*, and in fact found that the petitioner had *failed* to establish prejudice with respect to each of his ineffective assistance claims. *See id*. at 293-97. The court did discuss the fee structure by which the appointed private attorney was compensated, but only in the context of determining whether Maryland had established an appropriate "mechanism for the appointment, compensation, and reimbursement of counsel" in capital cases under 28 U.S.C. § 2261 such that the state was entitled to the expedited habeas review procedures for capital cases enacted in the AEDPA. *See Baker*, 220 F.3d at 284-86. Finally, in *Williamson v. Reynolds*, 904 F. Supp. 1529 (E.D. Okla. 1995), *aff'd*, 110 F.3d 1508 (10th Cir. 1997), the court observed that the system of appointing private attorneys to represent defendants in capital cases is "afflicted with many pitfalls, including . . . meager compensation for services." *Id*. at 1552 n.9. However, the court analyzed the petitioner's ineffective assistance claims solely under the *Strickland* test, specifically finding prejudice from counsel's deficient performance. *See id*. at 1536, 1544, 1546.

In short, petitioner has cited no law, much less "clearly established federal law as determined by the Supreme Court," which suggests that the fee structure in this case raises a presumption of prejudice. Accordingly, petitioner is not entitled to such a presumption, and the Court should analyze petitioner's ineffective assistance claims under both prongs of the *Strickland* test. *Cf. McNair v. Haley*, 97 F. Supp. 2d 1270, 1276 (M.D. Ala. 2000) (Alabama's system which inadequately compensated counsel did not constitute cause for procedural default in absence of showing that the

17

inadequate funding caused counsel to forfeit the issues).

### b. Lack of Time Meeting/Preparing

Petitioner contends that counsel was ineffective for failing to meet with him more often and for inadequately preparing for trial.  Apart from the issues identified in petitioner's failure to investigate and call witness claims discussed below, petitioner does not explain any prejudice arising from counsel's alleged lack of meeting time and preparing.  "[B]revity of time spent in consultation, without more, does not establish that counsel was ineffective."  *Easter v. Estelle*, 609 F.2d 756, 759 (5th Cir. 1980).  Nor is there any "case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel."  *United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir. 1988) (internal quotation omitted).  Absent specific allegations establishing both that the time counsel spent with petitioner was inadequate and that petitioner was prejudiced by counsel's inadequate consultation, petitioner is not entitled to habeas relief.  *See Neal v. Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997); *United States v. Soto-Alvarez*, 958 F.2d 473, 478 (1st Cir. 1992); *United States v. Mealy*, 851 F.2d 890, 908 (7th Cir. 1988); *Adanandus v. Johnson*, 947 F. Supp. 1021, 1095 n.17 (W.D. Tex. 1996); *United States v. Wright*, 845 F. Supp. 1041, 1072 (D.N.J. 1994).

### c. Failure to Investigate/Present Exculpatory Evidence

Turning to the issues specifically identified by petitioner, he claims that counsel was ineffective for failing to investigate: (1) the marital home to look for evidence such as sexual devices, photographs, and pornographic magazines; and (2) the source of the blood on the knife.  Petitioner also contends that counsel was ineffective for failing to call petitioner's parents to testify at trial.  The Court should conclude that the Michigan Court of Appeals's rejection of each of these claims was reasonable.

18

(i)      <u>Sexual Evidence in the Marital Home:</u> Petitioner first contends that counsel was ineffective for failing to examine the house, which would have uncovered the pornographic magazines and the victim's e-mail soliciting a sexual partner to join her and petitioner.  Petitioner contends that this evidence would have rebutted the prosecution's claims that petitioner forced the victim to purchase pornographic magazines and would have corroborated his claims that they viewed such magazines as a normal part of their sex life.  The e-mails, petitioner asserts, would have corroborated his claim that the victim had used the dildo on herself, rather than being raped with it by him.  The Michigan Court of Appeals rejected this claim, reasoning that the evidence of the magazines "would not, contrary to defendant's argument on appeal, have demonstrated that Mooney voluntarily bought a sexually-explicit magazine and alcohol on the night of the assaults." *Mooney*, 2003 WL 22112325, at *9, slip op. at 9.  The court also reasoned that the e-mail evidence would not have altered the outcome of the trial because the victim "*admitted* that she sometimes voluntarily used the dildo; using the emails in the way defendant suggests (even assuming that they would have been admissible at trial) would not have contributed to defendant's defense." *Id*.

Petitioner cannot show that the court of appeals's resolution of this issue was unreasonable.  Contrary to petitioner's argument, the mere existence of the magazines in the home would not provide any evidence showing whose magazines they were, nor whether the victim viewed them of her own volition.  Indeed, that the magazines remained in the home for two months despite the victim having moved out suggests the contrary conclusion.  Likewise, evidence suggesting that the victim used the dildo on herself would have been cumulative to her own testimony that she sometimes did so.  And, in any event, whether petitioner and the victim sometimes viewed pornographic magazines or used the dildo together would not in any way have resolved the principal issue in the case: whether petitioner's use of the dildo on the night of the assault was consensual or was an act of sexual assault.

19

Thus, there is not a reasonable probability that, had the evidence been presented to the jury, the result of the trial would have been different.

(ii)     <u>Source of Blood on the Knife:</u> With respect to the knife, petitioner contends that counsel was ineffective for failing to have the blood tested to see whose blood it was, and to have the knife tested for fingerprints.  Gatesman testified that he declined to have the knife tested because it would be better to argue reasonable doubt based on the state's failure to investigate rather than risk an adverse result from the testimony.  The court of appeals rejected petitioner's claim on the prejudice prong, explaining that "testing to see whether the knife had defendant's blood on it would have yielded little useful information, given that defendant *admittedly* had a cut on his wrist that could have caused his blood to get on the knife.  Nor would testing the knife for fingerprints have been useful, given that [the victim] shared the house and obviously had access to the kitchen implements."  *Mooney*, 2003 WL 22112325, at *9, slip op. at 9.

Again, petitioner cannot show that this resolution of the prejudice prong was unreasonable.  First, as the court of appeals explained, even if such testing revealed defendant's blood and the victim's fingerprints on the knife, the presence of this evidence was readily explainable by the victim's domicile in the home and the cut on petitioner's wrist.  Further, there was no question that petitioner himself first wielded the knife.  Although he testified that he held the knife to himself and threatened to commit suicide, there was no question even under petitioner's version of events that he first possessed the knife, and that he and the victim struggled over the knife.  Again, the evidence would not have answered, or provided any evidence to answer, the question of whether petitioner physically and sexually assaulted the victim.  Thus, even if the evidence had been tested and the testing had shown what petitioner claims it would have shown, there is not a reasonable probability that the result of the proceeding would have been different.

(iii)     <u>ATM Withdrawals:</u> Petitioner also argues that counsel was ineffective for failing to investigate the victim's ATM withdrawals, which petitioner contends would have shown that the victim made several withdrawals on the evening of the assault on their way to their drug supplier. In turn, petitioner argues, this would have corroborated his testimony that the victim also used cocaine. The court of appeals rejected this claim, reasoning that the evidence could not have affected the outcome of the trial because "[p]eople commonly make ATM withdrawals for reasons other than to purchase illegal drugs." *Mooney*, 2003 WL 22112325, at *9, slip op. at 9. Again, this determination was reasonable.

Petitioner has not explained how the fact of the victim's ATM withdrawals would have corroborated his testimony that she used cocaine. Even if the timing of the withdrawals coincided with the trip to the drug supplier, this would establish neither that purchasing drugs was the purpose of the withdrawal or, if it was, that the purchase was not solely for petitioner's benefit. And, again, the evidence of the victim's drug use was at best only tangentially related to the consent issue which was the focus of the case. Thus, there is not a reasonable probability that the result of the proceeding would have been different had this evidence been introduced.

(iv)     <u>Testimony of Petitioner's Parents:</u> Finally, petitioner contends that trial counsel was ineffective for failing to call his parents to testify concerning the evidence of the victim's drinking on the night of the assault and the e-mail and pornographic magazine evidence which supposedly shed light on her sexual lifestyle. Petitioner also notes that his mother would have testified that the victim admitted to having an affair, which would have contradicted her trial testimony that she did not have an affair and that petitioner had only imagined that she did so. The Michigan Court of Appeals rejected this claim, concluding that counsel's decision not to call petitioner's parents was a reasonable trial strategy, and that counsel's strategy did not deprive petitioner of a substantial defense. *See*

21

*Mooney*, 2003 WL 22112325, at *9, slip op. at 10.  The Court should conclude that this determination was reasonable.

Generally, "[c]omplaints of uncalled witnesses are not favored in federal habeas review." *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985); *Aponte v. Scully*, 740 F. Supp. 153, 158 (E.D.N.Y. 1990).  As one court has explained:

> The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.  [Defendant] does not identify any witnesses that his counsel should have called who would have been helpful.  Defense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation.  Decisions whether to engage in cross examination, and if so to what extent and in what manner, are similarly strategic in nature.

*United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *accord Reese v. Fulcomer*, 946 F.2d 247, 257 (3d Cir. 1991) (counsel's performance not deficient where counsel did not call alibi witness whose testimony could have been damaging); *United States v. Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (decision not to call witnesses who could have incriminated defendant within scope of informed professional judgment).

Here, counsel testified at the evidentiary hearing that he did not call petitioner's parents because he did not believe their testimony would be relevant, and because the jury would not find them credible in light of their relationship to petitioner.  Petitioner contends that this strategy was not reasonable because counsel did not understand the full import of their testimony.  However, petitioner does not explain why this is so, beyond noting that counsel did not take notes when he met with his parents.  And even if petitioner were correct that counsel's strategy was unreasonable, that showing alone would be insufficient for habeas relief.  Petitioner must also show that the Michigan Court of Appeals's conclusion that counsel's strategy was not unreasonable was itself unreasonable.  Petitioner has failed to clear this high hurdle.

22

Moreover, petitioner cannot establish prejudice from the absence of this testimony.  As discussed above, neither the evidence of the drinking nor the evidence of the victim's sexual lifestyle had any bearing on the substantive issue of whether petitioner physically and sexually assaulted the victim.  Likewise, the evidence of the victim's extramarital affair was introduced to establish motive.  Although the victim testified that the affair was imagined by petitioner, rather than real as she supposedly told petitioner's mother, the motive remained the same regardless of whether the affair was real or merely imagined by petitioner.  That is, the motive alleged by the prosecutor was petitioner's belief that the victim had an affair, and that belief was the relevant fact without regard to the correctness of that belief.  At most, then, the evidence from petitioner's parents would have cast doubt on the victim's credibility.  However, in light of their own reasons for protecting their son from criminal charges, and the fact that the jury credited the victim over petitioner despite the victim's testimony being damaged through cross-examination and petitioner's testimony, petitioner cannot show a reasonable probability that the result of the proceeding would have been different had his parents been called to testify.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d.  Failure to Object

Petitioner next contends that counsel was ineffective for failing to object to prosecutorial misconduct at trial.  As discussed below, petitioner's prosecutorial misconduct claims are without merit because the prosecutor's actions were either not improper or not prejudicial.  To the extent the prosecutor's actions were not improper, counsel was not deficient in failing to raise a meritless objection.  *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993).  To the extent that the prosecutor's actions were improper but not sufficiently egregious to deprive petitioner of a fair trial, petitioner cannot show that he was prejudiced by

23

counsel's performance. *See White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial); *Rich v. Curtis*, No. 99-CV-73363, 2000 WL 1772628, at *8 (E.D. Mich. Oct. 24, 2000) (Friedman, J.) (same); *Taylor v. Galaza*, No. C 99-2110, 2000 WL 365047, at *5-*6 (N.D. Cal. Apr. 4, 2000) (no prejudice from counsel's failure to request more specific defense theory instruction where court's instructions as a whole adequately conveyed defense theory and petitioner was not denied a fair trial by omission of specific instruction). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### e. Conceding Guilt

Finally, petitioner contends that his trial counsel was ineffective for conceding his guilt on the assault charge during closing argument. During argument, counsel stated:

> One of the charges is an Assault with a dangerous weapon. And maybe it is reasonable for you to believe, at some point, when the knife's being used in the manner that Mr. Mooney described for you, that at some point, she believed that the knife was trying to be used on her and that she was in fear. That might be reasonable based on all the evidence that you've heard in this case. But when you look at the jury form and it gives you the choice regarding the two sexual, Criminal Sexual Conduct cases that's where your difficult decision comes in.

Trial Tr., Vol. IV, at 134. The Michigan Court of Appeals rejected this claim, concluding that counsel's argument did not amount to a concession of guilt on the assault charge because "[c]ounsel used the term 'might' and failed to discuss an essential element of assault with a dangerous weapon–that defendant intended to injur[e] [the victim] or place her in fear of an immediate battery." *Mooney*, 2003 WL 22112325, at *11, slip op. at 11.

Contrary to petitioner's argument, counsel's comments did not amount to a plea of guilty in violation of his Sixth Amendment rights. It is true that "counsel lacks authority to consent to a guilty

24

plea on a client's behalf; moreover, a defendant's tacit acquiescence in the decision to plead guilty is insufficient to render the plea valid." *Florida v. Nixon*, 543 U.S. 175, 187-88 (2004) (citations omitted). Nevertheless, the Court in *Nixon* declined to equate a concession of guilt made as part of a trial strategy with a plea of guilty. In that case, defense counsel conceded his client's substantive guilt and focused on trying to spare his client from the death penalty during the sentencing phase of the proceedings. The Court rejected the defendant's claim, reasoning that despite counsel's concession, the defendant

> retained the rights accorded a defendant in a criminal trial. The State was obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which [defendant] was charged. . . . Further, the defense reserved the right to cross-examine witnesses for the prosecution and could endeavor, as [counsel] did, to exclude prejudicial evidence. In addition, in the event of errors in the trial or jury instructions, a concession of guilt would not hinder the defendant's right to appeal.

*Id.* at 188 (citations omitted). For these reasons, the Court rejected the state court's "erroneous equation of [counsel's] concession strategy to a guilty plea[.]" *Id.* at 189. The Court also explained that the normal *Strickland* standard governs the analysis of counsel's strategic decision. *See id.* at 189-90.

The lesson of *Nixon*, as reflected in cases decided both before and after that decision, is "that counsel's concession of a client's guilt does not automatically constitute deficient performance." *Young v. Catoe*, 205 F.3d 750, 759 (4th Cir. 2000). More specifically, "conceding guilt to one count of a multi-count indictment to bolster the case for innocence on the remaining counts is a valid trial strategy which, by itself, does not rise to the level of deficient performance." *United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002). As the *Holman* court explained, "[c]onceding an indefensible charge is thought to build credibility with a jury by acknowledging the overwhelming evidence of guilt for that particular charge, creating goodwill and trust that can be applied towards

25

arguments attacking the remaining charges." *Id.*; *see also*, *Clozza v. Murray*, 913 F.2d 1092, 1099 (4th Cir. 1990) ("[T]here is a distinction which can and must be drawn between . . . a tactical retreat and . . . a complete surrender.").

Here, counsel's strategy amounted to a tactical retreat, not a complete surrender. First, as the court of appeals observed, counsel did not actually concede guilt. He suggested that petitioner's own testimony *might* support a finding that the victim felt threatened, not that it was the only conclusion that could be reached, and he did not suggest that the evidence proved all of the essential elements of the crime, *i.e.*, petitioner's intent. Moreover, the evidence with respect to the assault charge was much stronger than the evidence with respect to the criminal sexual conduct charge. Petitioner's own testimony and the victim's undisputed injuries corroborated her assault claim, whereas her sexual assault claim was not corroborated by any other evidence. And, the assault conviction carried a maximum penalty of four years' imprisonment, *see* MICH. COMP. LAWS § 750.82(1), as opposed to a potential life sentence on the criminal sexual conduct charges, *see* MICH. COMP. LAWS § 750.520b(2)(a). In light of the differences in the quality of evidence supporting each charge and the potential penalties for conviction on each charge, counsel's decision to offer a partial concession of guilt on the assault charge was a reasonable trial strategy, and the Michigan Court of Appeals's conclusion to this effect was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Prosecutorial Misconduct (Claim III)*

Petitioner next contends that he was denied a fair trial by several instances of prosecutorial misconduct. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that

the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

2.    *Analysis*

*a. Misstatement of Facts in Cross-Examination*

Petitioner first contends that he was denied a fair trial when the prosecutor repeatedly misstated facts in the formulation of cross-examination questions of petitioner. Each of these claims is without merit.

The Michigan Court of Appeals determined that the prosecutor's questions either were not improper or were not prejudicial. *See Mooney*, 2003 WL 22112325, at *5-*6, slip op. at 5-6. This determination was reasonable. For example, in posing a question to petitioner the prosecutor stated that the victim's menstrual period had ended on the night of the assaults. *See* Trial Tr., Vol. IV, at 80. However, petitioner admitted himself that he did not know for a fact that the victim's menstrual cycle had not ended, *see id*., and the victim testified that her period had "pretty much" come to an end.

27

*See id.*, Vol. II, at 83, 124-25.  Likewise, the prosecutor's question concerning whether the medical personnel who treated petitioner had looked for glass in the wrist wound  was a fair question based on the absence of any such examination in the medical reports.  In another question, the prosecutor suggested that petitioner's testimony concerning knowing about a first affair in the first year he and the victim were married was different from his prior testimony.  *See id.*, Vol. IV, at 84.  However, defense counsel objected, and the prosecutor withdrew the question.  *See id.*

It is true that two questions, those relating to petitioner's explanation for the injury to his wrist and the time when the cut on his back occurred, misstated petitioner's prior testimony.  However, with respect to these questions, and the other proper questions as well, petitioner cannot show that he was denied a fair trial, for two reasons.  First, the prosecutor's statements were in the form of cross-examination questions.  With respect to each alleged misstatement, petitioner was given the opportunity to, and did in fact, correct the prosecutor's misstatements.  Second, the trial court instructed the jury that the questions of the lawyers was not evidence.  *See* Trial Tr., Vol. IV, at 155. This instruction, which the jury is presumed to have followed, negated any prejudice arising from the prosecutor's questions.  *See Crespo v. Armontrout*, 818 F.2d 684, 687 (8th Cir. 1987).

Petitioner also argues that the prosecutor expressed sarcasm in formulating some of his questions.  *See* Trial Tr., Vol. IV, at 78, 91, 102-03.  Petitioner does not argue, however, that these comments misstated the facts or were not fair inferences drawn from petitioner's testimony and the other evidence at trial.  Thus, the sarcastic comments did not deprive petitioner of a fair trial.  *See Estelle v. Booker*, No. 05-CV-72458, 2006 WL 2250959, at *11 (E.D. Mich. Aug. 3, 2006) (Rosen, J., adopting Report and Recommendation of Komives, M.J.) (citing *Davis v. Burt*, 100 Fed. Appx. 340, 348 (6th Cir. 2004); *Hernandez v. Bartlett*, 796 F. Supp. 77, 80 (E.D.N.Y. 1992)).

*b.  Introduction of Inadmissible Evidence*

Petitioner also contends that he was denied a fair trial by the prosecutor's introduction of admissible evidence. The Court should disagree. With respect to the prosecutor's introduction of the victim's prior written statement, as the Michigan Court of Appeals explained petitioner cannot show prejudice because the victim's testimony was corroborated through testimony of her statements to Officer Danforth, her coworkers, and Dr. Grant. Petitioner did not, and does not here, challenge the admissibility of this evidence. *See Mooney*, 2003 WL 22112325, at *3, slip op. at 4. Thus, the prior written statement was cumulative, and its admission did not affect the outcome of the trial.

With respect to OfficerWalter's testimony on cross-examination that he had previously been to the victim's home, the prosecutor did attempt to elicit the reason for this visit on redirect examination. However, defense counsel objected, the court sustained the objection, Officer Walter did not given an answer to the question, and the trial court instructed the jury both that the fact that Officer Walter may have been at the home on a prior occasion was immaterial and that the prosecutor's questions are not evidence. *See* Trial Tr., Vol. III, at 69. In light of this curative instruction and the fact that the prosecutor's question was never answered, petitioner cannot show that the question denied him a fair trial.

Finally, with respect to the prosecutor's elicitation of evidence that petitioner was incarcerated as a result of the charges against him, petitioner himself testified to this fact on direct examination prior to the prosecutor's questions on cross-examination. *See* Trial Tr., Vol. IV, at 83. Because petitioner himself first presented this evidence to the jury, petitioner cannot show that the prosecutor denied him a fair trial by again eliciting the information on cross-examination.

### c. *Closing Argument Statements*

Petitioner next contends that the prosecutor committed misconduct by several statements made during closing argument. The Court should conclude that petitioner is not entitled to relief ont this

basis.

First, petitioner contends that the prosecutor committed misconduct by suggesting that the victim was more credible because she had written a statement on the morning of the assault which was consistent with her trial testimony. *See* Trial Tr., Vol. IV, at 116-17. However, the evidence as admitted at trial, and the court of appeals found no error in the admission of the statement. Thus, the prosecutor's comment was a permissible characterization based on the evidence admitted at trial, and was not improper. *See, e.g., Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]").[3]

Petitioner also contends that the prosecutor improperly stated that petitioner had cut up "hundreds" of pairs of the victim's underpants, when he actually testified that he cut up a "sizable pile," and improperly stated that he had a "ton" of cocaine in his system, when he testified only that he had consumed three lines (one-quarter gram). *Compare* Trial Tr., Vol. IV, at 118 *with id.* at 61, and *id.* at 142 *with id.* at 75. In context, however, it is clear that the prosecutor was not stating as a literal fact that petitioner had cut up hundreds of pairs or underwear or had actually consumed 2,000

---

[3]Importantly, where, as here, a prior consistent statement is admitted pursuant to Rule 801(d)(1)(B) to rebut a charge of fabrication, the statement is deemed "non hearsay" and thus is admissible as substantive evidence. *See Tome v. United States*, 513 U.S. 150, 157 (1995).

pounds of cocaine; rather, the prosecutor was merely using "hundreds" and "a ton" to mean a lot. This use of hyperbole to make a point which was a fair inference from the evidence did not deprive petitioner of a fair trial. *See United States v. Knox*, 68 F.3d 990, 1001 (7th Cir. 1995); *see also*, *United States v. Vaccaro*, 115 F.3d 1211, 1216 (5th Cir. 1997) (in analyzing a prosecutorial misconduct claim, a court "assume[s] that a jury has the common sense to discount the hyperbole of an advocate."); *Calkin v. Purkett*, 45 F.3d 1229, 1235 (8th Cir. 1995) ("[W]e credit the jurors with the sense to separate the prosecutor's hyperbole from the evidence in the case.").

Finally, petitioner contends that the prosecutor improperly shifted the burden of proof during rebuttal argument by stating that it would be worse for petitioner to get away with assaulting the victim than for him to be falsely accused. Petitioner cannot show that this comment deprived him of a fair trial. First, the prosecutor's comments were a fair response to defense counsel's closing argument, in which counsel stated that there was "[o]ne thing worse than what happened to Miss Mooney on December 15th that could be worse than being violated in your home in a sexual manner. And that would be to be falsely accused of it." Trial Tr., Vol. IV, at 135. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (one factor in evaluating claims of prosecutorial misconduct is whether the prosecutor's statement was "invited by or was responsive to the [closing argument] of the defense."). Further, the prosecutor's comment did not misstate the law, suggest that petitioner had the duty to come forward with any evidence, or otherwise imply that petitioner bore the burden of proving his innocence. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Replaying of Victim's Testimony (Claim IV)*

Finally, petitioner contends that he was denied a fair trial by the trial court's allowing the video recording of the victim's testimony to be played back to the jury. Petitioner contends that the

video recording system responds to noises from the microphones, and thus the camera bounces from camera to camera and is not always that of the witness.  Petitioner argues, therefore, that the video recording of the testimony, which included images of the petitioner, defense counsel, the prosecutor, and the judge, included elements which were not part of the victim's testimony.  The Michigan Court of Appeals rejected petitioner's claim, noting that the trial court had instructed the jurors to use their collective memories and had ensured that the play-back included defense counsel's cross-examination of the victim.  *See Mooney*, 2003 WL 22112325, at *11, slip op. at 11.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

To the extent petitioner's claim is based on the use of video play-back alone, the claim is without merit.  In his brief, petitioner points to a number of state and federal cases disapproving the use of video play-back in response to a jury's request to rehear testimony.  However, he has not cited a single case, much less identified any clearly established federal law as determined by the Supreme Court, which suggests that the playing back of video testimony amounts to a violation of due process.  And, contrary to petitioner's argument, the video did not include any evidence which was not in full view of the jury.  While it is true that the camera at times focused on other participants than the witness, it is equally true that the jurors were not necessarily focused on the witness at all times.  Indeed, as described by petitioner, the camera tended to focus on whoever was talking (*i.e.*, an attorney when asking a question, the witness when answering, the judge when making a ruling), and it would not be odd that the attention of the jurors' would similarly shift focus depending on who was talking at the particular time.

To the extent that petitioner's claim is that decision to allow the play-back of the victim's testimony violated his right to due process because it caused the jury to unduly focus on the victim's testimony, the claim is likewise without merit.  As has been noted in the context of direct review of

federal convictions, a trial judge has wide latitude in choosing how to respond to questions from the jury. *United States v. Felix-Rodriguez*, 22 F.3d 964, 966 (9th Cir. 1994); *United States v. Licavoli*, 725 F.2d 1040, 1049 (6th Cir. 1984). This statement is even more true in a habeas case where the federal court is not concerned with the manner in which the trial judge exercised his or her discretion, but whether the petitioner received a fundamentally fair trial. Here, the trial judge assured that petitioner's due process rights would not be violated by playing back the victim's testimony by (1) requiring the jury to use its collective memory to recall the testimony before agreeing to play the testimony for the jury, and (2) ensuring that the playback included the whole of the victim's testimony, including her cross-examination by defense counsel. Petitioner has offered nothing to show that the trial court's exercise of its discretion deprived him of a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Request for Evidentiary Hearing*

In his petition and brief in support, petitioner also requests an evidentiary hearing. The Court should deny this request. In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254; and (2) whether a hearing is permitted under 28 U.S.C. § 2254(e)(2).

Regardless of whether an evidentiary hearing is permissible, such a hearing is not necessary to resolve petitioner's claims. In making the determination of whether an evidentiary hearing is necessary under Rule 8, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also*, *Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law);

*cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).  Here, an evidentiary hearing would not have the potential to advance petitioner's claims.  Petitioner's trial error claims relating to prosecutorial misconduct and the rereading of testimony are resolvable on the basis of the trial record alone, and petitioner's ineffective assistance of counsel claims are resolvable on the basis of the trial record and the evidentiary hearing held on those claims in state court.  The only new evidence which could be presented would be evidence going to the victim's alleged perjury and petitioner's innocence.  As explained in this Report, however, those claims would not entitled petitioner to habeas relief even if his version of the facts were true.  Accordingly, the Court should conclude that an evidentiary hearing is not necessary, and should deny petitioner's request.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation*

34

*of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 1/12/07

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on January 12, 2007.

s/Eddrey Butts
Case Manager